**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- X

DIANA BABAYEVA,                                    :
                                                   :     Civil Action No. 16-cv-03794
                              Plaintiff,           :     (RA)(KNF)
                                                   :
              v.                                   :
                                                   :
HALSTEAD MANAGEMENT COMPANY,                       :
LLC, d/b/a HALTEAD, PENMARK                        :
MANAGMENET LLC, PENMARK REALTY                     :
CORPORATION, and TERRA HOLDINGS,                   :
LLC,                                               :
                                                   :
                              Defendants.          :
---------------------------------------------------------------- X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS**
**PENMARK REALTY CORPORATION'S AND TERRA HOLDINGS, LLC'S**
**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**WIGDOR LLP**

Lawrence M. Pearson
Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

I.      Plaintiff Is Hired by Leslie Winkler, Vice President, Director of Management at Penmark Realty, to be Her Assistant, but Is Quickly Assigned to also Serve as an Assistant Property Manager ................................................................................... 4

II.     Halstead Management Purchases the Assets of Penmark Realty ........................ 5

III.    Plaintiff's Primary Duty as an Assistant Property Manager ............................... 6

IV.    Plaintiff's Duties and Responsibilities as Assistant to Leslie Winkler and To a Lesser Extent Paul Gottsegen and Martha Goupit ............................................... 7

V.     Plaintiff's "Office Manager" Clerical Duties ..................................................... 8

VI.    Plaintiff Helped Coordinate, But Did Not Supervise, APMs ........................... 10

VII.   Plaintiff Did Not Supervise Front Desk Receptionists ..................................... 11

VIII.  Plaintiff Repeatedly Raises Concerns About Her Erroneous Overtime-Exempt Classification, But Is Rebuffed by the Company Each Time ............................. 12

IX.    There Is No Credible Evidence that Defendants Took Any Action to Determine Plaintiff's Correct Overtime Classification ........................................................ 13

X.     Plaintiff's Compensation in Comparison to that of Non-Exempt APMs .......... 14

XI.    Plaintiff Resigned and Defendants Hired Kristen Olmsted to Replace Her ...... 14

XII.   Terra Holdings Jointly Controlled Plaintiff's Employment and Was Effectively a Joint or Single Employer with the Other Halstead/Penmark Entities ................. 15

ARGUMENT ....................................................................................................................... 16

I.      Summary Judgment Standard .............................................................................. 16

II.     Plaintiff Is Entitled to Summary Judgment on Defendants' Liability under the FLSA and NYLL ................................................................................................. 17

        A.    Plaintiff Was Not an Exempt Administrative Employee ....................... 18

       i.      Background of the FLSA and Administrative Exemption........................18

      ii.     Plaintiff's Duties Were Not "Directly Related" to General Operations ...............................................................................................19

     iii.    Plaintiff Performed Work that Involved Day-To-Day Business Operations, and *Not* "Administrative" Duties Running Defendants' Business ..........................................................................................20

     iv.    Plaintiff's Primary Duty Did Not Involve the Exercise of Independent Judgment and Discretion with Respect to Matters of Significance.............................................................................................22

B.     Plaintiff Also Is Entitled to Summary Judgment on the "Executive" Exemption ...........................................................................................26

       i.      Relevant Law and Regulations ................................................26

      ii.     Plaintiff's Primary Duty Was Not Managerial ..........................................28

            a.     Plaintiff Spent the Vast Majority of Her Time on Non-Exempt Work .............................................................29

            b.     Plaintiff Was Closely Supervised by Her Managers.....................29

            c.     Plaintiff's Non-Exempt Duties Were More Important Than Any of Her Even Arguably Exempt Duties, Which Were Minor ..................................................................30

            d.     Plaintiff's Effective Wages Were Less Than Those of Her Non-Exempt Co-Workers, Who She Was Supposedly Supervising ..............................................................30

     iii.    Plaintiff Did Not Have the Authority to Hire or Fire................................32

C.     Plaintiff Is Entitled to Summary Judgment on Willfulness ...................................34

D.     Plaintiff Is Entitled to Summary Judgment on the Overtime Calculation Method ...........................................................................................35

       i.     The "Time-and-a-Half" Method Versus the Strictly Limited "FWW" Model.............................................................................35

      ii.     The "FWW" Model is Inapplicable in this Case .......................................37

E.      Defendants Have Failed to Show that there Is No Genuine Issue of
        Material Fact that Terra Was Not Plaintiff's Employer.........................................38

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

Ale v. Tennessee Valley Auth.,
269 F.3d 680 (6th Cir. 2001) ...................................................................... *passim*

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........................................................................................ 17

Arnold v. Ben Kanowsky, Inc.,
361 U.S. 388 (1960) .................................................................................. 17, 22

Ayers v. SGS Control Servs., Inc.,
No. 03 Civ. 9078 (RMB), 2007 WL 3171342 (S.D.N.Y. Oct. 9, 2007) ................................ 36

Blotzer v. L-3 Communications Corp.,
No. 11 Civ. 274 (TUC)(JGZ), 2012 WL 6086931 (D. Ariz. Dec. 6, 2012) .......................... 38

Bothell v. Phase Metrics, Inc.,
299 F.3d 1120 (9th Cir. 2002) .................................................................... 19, 24

Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc.,
No. 11 Civ. 8670 (JPO)(RLE), 2013 WL 1285295 (S.D.N.Y. Mar. 29, 2013) ............... 29, 31

Chenensky v. New York Life Ins. Co.,
No. 07 Civ. 11504 (WHP), 2010 WL 2710586 (S.D.N.Y. June 24, 2010) .......................... 18

Clark v. J.M. Benson Co.,
789 F.2d 282 (4th Cir. 1986) ........................................................................ 20

Clougher v. Home Depot U.S.A., Inc.,
696 F. Supp. 2d 285 (E.D.N.Y. 2010) ........................................................ 29, 30

Cooke v. Gen. Dynamics Corp.,
993 F. Supp. 56 (D. Conn. 1997) .................................................................... 20

Costello v. Home Depot USA, Inc.,
944 F. Supp. 2d 199 (D. Conn. 2013) ........................................................ 32, 37

Costello v. Home Depot USA, Inc.,
928 F. Supp. 2d at 473, 495 (D. Conn. 2013) .................................................... 30

Davis v. J.P. Morgan Chase & Co.,
587 F.3d 529 (2d Cir. 2009) .......................................................................... 19

Department of Labor v. City of Sapulpa,
   30 F.3d 1285 (10th Cir. 1994) ........................................................................ 18

Ebert v. Holiday Inn,
   No. 11 Civ. 4102 (ER), 2014 WL 349640 (S.D.N.Y. Jan.31, 2014) ..................... 24

Hart v. Rick's Cabaret Int'l, Inc.,
   No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. 2010) ...................................... 39

Herman v. RSR Sec. Servs. Ltd.,
   172 F.3d 132 (2d Cir. 1999) ............................................................................ 39

Indergit v. Rite Aid Corp.,
   No. 08 Civ. 11364 (PGG), 2010 WL 1327242 (S.D.N.Y. Mar. 31, 2010) ............. 30

Klein v. Torrey Point Grp., LLC,
   979 F. Supp. 2d 417 (S.D.N.Y. 2013) .......................................................... 36, 37

Martinez v. Hilton Hotels Corp.,
   930 F. Supp. 2d 508 (S.D.N.Y. 2013) ........................................................ passim

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986) ....................................................................................... 17

Neary v. Metro. Prop. & Cas. Ins. Co.,
   517 F. Supp. 2d 606 (D. Conn. 2007) .............................................................. 20

Okoro v. Marriott Int'l, Inc.,
   No. 07 Civ. 157, 2008 WL 4449386 (S.D.N.Y. Sept. 29, 2008) .......................... 17

Overnight Motor Transp. Co. v. Missel,
   316 U.S. 572 (1942) ....................................................................................... 36

Parada v. Banco Indus. De Venez., C.A.,
   753 F.3d 62 (2d Cir.2014) ............................................................................... 34

Rainey v. Am. Forest & Paper Ass'n, Inc.,
   26 F. Supp. 2d 82 (D.D.C. 1998) ................................................................ 24, 25

Relyea v. Carman, Callahan & Ingham, LLP,
   No. 03 Civ. 5580 (DRH)(MLO), 2006 WL 2577829 (E.D.N.Y. 2006) ................... 21

Ruggeri v. Boehringer Ingelheim Pharm., Inc.,
   585 F. Supp. 2d 254 (D. Conn. 2008) .............................................................. 20

Schaefer v. Ind. Mich. Power Co.,
    358 F.3d 394 (6th Cir. 2004) ................................................ 23

Siegel v. Bloomberg L.P.,
    No. 13 Civ. 1351 (DF), 2016 WL 1211849 (S.D.N.Y. Mar. 22, 2016).................................. 33

Solis v. Cindy's Total Care, Inc.,
    No. 10 Civ. 7242 (PAE), 2012 WL 28141 (S.D.N.Y. Jan. 5, 2012)...................................... 38

Stultz v. J.B. Hunt Transp. Inc.,
    No. 13 Civ. 13705(PJD), 2014 WL 3708807 (E.D. Mich. July 28, 2014) ........................... 38

Torres v. Gristede's  Operating Corp.,
    628 F. Supp. 2d 447 (S.D.N.Y. 2008) ....................................................................... 2

Yourman v. Dinkins,
    865 F. Supp. 154 (S.D.N.Y. 1994)................................................................. 35, 37

Zheng v. Liberty Apparel Co.,
    355 F.3d 61 (2d Cir. 2003) ............................................................................ 2, 39

**Other Authorities**

12 N.Y.C.R.R. § 142-2.2 ............................................................................... 2

29 C.F.R. § 541 ..................................................................................... *passim*

29 C.F.R. § 578 ............................................................................................ 3

29 C.F.R. § 778 ......................................................................................... 36

29 U.S.C. § 203 ..................................................................................... 38, 39

29 U.S.C. § 207 ..................................................................................... 17, 35

29 U.S.C. § 213 ......................................................................................... 18

29 U.S.C. § 216.......................................................................................34, 35

29 U.S.C. § 260 .......................................................................................34, 35

Fed. R. Civ. P. 56 ................................................................................. 16, 17

U.S. Dep't of Labor Wage & Hour Div., FIELD OPERATIONS HANDBOOK (2016) ...................... 24

Plaintiff Diana Babayeva submits this memorandum of law in support of her cross-motion for summary judgement on: (i) the liability of Defendants Halstead Management Company, LLC d/b/a Halstead ("Halstead"), Penmark Management LLC ("Penmark") and Terra Holdings, LLC ("Terra") (together, "Defendants" or the "Company") under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"); (ii) the non-applicability of the administrative and executive overtime exemptions to Plaintiff; (iii) the "willfulness" of Defendants' unlawful conduct; and (iv) the proper method for measuring Plaintiff's unpaid overtime wages.  Plaintiff also opposes Defendants' motion for partial summary as to Terra.[1]

## PRELIMINARY STATEMENT

Throughout her nearly seven years at the Company, Plaintiff worked over 40 hours each week, and sometimes up to 70 hours a week, but did not receive overtime pay because of her misclassification as overtime-exempt.  The record makes it obvious that Ms. Babayeva's primary role was Assistant Property Manager ("APM") (a non-exempt job), with the remainder of her time split between other non-exempt duties as an administrative assistant to Company executives and basic office-related tasks as an "Office Manager."  There is no genuine dispute on the material facts, which place Plaintiff far outside the narrowly construed overtime exemptions. Defendants will attempt to leverage minor aspects of Plaintiff's duties to argue that she falls into an exemption, but these are inadequate to overcome the weight of the undisputed evidence.

Defendants, inexcusably, never once did any meaningful analysis as to whether Plaintiff's duties in fact meant she was non-exempt.  This was willful and reckless (at least), as Plaintiff repeatedly questioned her overtime eligibility, and Defendants classified many other employees who performed the same duties as overtime eligible.

---

[1]     Plaintiff will not oppose the motion to dismiss Defendant Penmark Realty Corp., as Defendants Penmark and Halstead have indicated that they employed Plaintiff, and therefore would be liable for damages incurred by Plaintiff, during the full statute of limitations period.

An employee is overtime-exempt under the FLSA or NYLL[2] if her "primary duty" falls into one of the narrowly defined exemptions. In order for a genuine issue of material fact to exist, there must be more than relatively small examples from Plaintiff's seven years of work that were arguably exempt tasks. Although the parties may dispute the <u>precise</u> amount or proportion of time Plaintiff devoted to her various duties (e.g., time she spent as an APM versus as an administrative assistant or so-called "office manager"), such disputes are immaterial here. This is because the duties and responsibilities Plaintiff <u>indisputably</u> spent the vast majority of her time on were non-exempt. <u>See</u> 29 C.F.R. § 541.700(a) ("'primary duty' means the principal, ... or most important duty that the employee performs [and] must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.").

We expect Defendants to assert that Plaintiff fell within the FLSA's administrative exemption (or perhaps the executive exemption), but Defendants cannot and have not produced evidence showing a genuine dispute about the work Plaintiff <u>in fact</u> performed (as opposed to arguing from descriptions on her resume). Defendants cannot show that Plaintiff's primary duty involved work directly related to management of a function or the general business operations of Defendants or their clients, or that her work entailed the <u>exercise of independent judgment and discretion with respect to matters of significance</u>, which rules out the administrative exemption.

Defendants repeatedly concede in the record that Plaintiff's APM job duties (on which she spent the bulk of her time) were non-exempt, and Halstead's President, Paul Gottsegen, testified that Plaintiff exercised little to no discretion or independent judgment in even simple matters, such as granting or denying an employee's request for time off. Plaintiff also was

---

[2]      Plaintiff's analysis focuses on federal law, but applies with equal force to claims under the NYLL, as its overtime provisions expressly incorporate the FLSA exemptions. See Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 456 (S.D.N.Y. 2008), citing 12 N.Y.C.R.R. § 142-2.2. Courts regularly look to the FLSA when considering the scope of overtime exemptions under the NYLL. See Zheng v. Liberty Apparel Co., 355 F.3d 61, 78 (2d Cir. 2003).

required to get approval to place large office supply orders, and her opinions on personnel decisions were rarely solicited, and even then were disregarded and not given particular weight.

Plaintiff also was clearly outside the "executive" or "managerial" exemption, because it is indisputable that: (a) her primary duties did not consist of managing Halstead's enterprise or any department or subdivision thereof; (b) she did not customarily and regularly direct the work of two or more employees; and (c) she did not have the authority to hire or fire employees or provide real input.  See 29 C.F.R. § 541.100(a).  Therefore, both the "administrative" and "executive"/"managerial" exemptions should be ruled inapplicable as a matter of law.[3]

Moreover, Defendants' violations were unambiguously willful, as they indisputably did not, but "should have inquired further into whether their conduct was in compliance with the Act, and failed to make adequate further inquiry."  29 C.F.R. 578.3(c)(3).  Plaintiff repeatedly asked her supervisor Leslie Winkler about overtime pay given her duties, but was rebuffed every time.  There is no credible evidence of any genuine audit, review or investigation regarding Plaintiff's overtime classification, but there are admissions that no such substantive inquiry was conducted.  Therefore, Plaintiff's FLSA claims should be subject to a three-year statute of limitations, and Plaintiff should be awarded liquidated damages in addition to overtime backpay.

Further, back overtime must be calculated based on the FLSA's standard time-and-one-half method.  Defendants failed to meet the strict requirements for using the halftime method of calculating overtime damages, known as the fluctuating workweek ("FWW") method, which is an exception to the FLSA's default rule.  The FWW was and is unavailable to Defendants

---

[3]     Notably, although Defendants represented to the Court numerous times that they would move for summary judgment on liability (i.e., the full merits of Plaintiff's claims), Defendants did not do so, and moved only on far more narrow issues.  Defendants therefore have already backed away from representations made to the Court regarding their ability to demonstrate Plaintiff's supposed exempt status.  See Dkt. Nos. 54, 57.

because: 1) Defendants never paid Plaintiff overtime; and 2) Defendants cannot show a mutual understanding that her salary covered all hours worked, no matter how few or how many.

There is no genuine issue of material fact that would preclude summary judgment in Plaintiff's favor on these issues. In addition, genuine material fact issues preclude summary judgment regarding whether Terra was Plaintiff's employer under the FLSA and NYLL.

## STATEMENT OF FACTS[4]

**I.    Plaintiff Is Hired by Leslie Winkler, Vice President, Director of Management at Penmark Realty, to be Her Assistant, but Is Quickly Assigned to also Serve as an Assistant Property Manager**

In October 2009, Plaintiff was hired by Leslie Winkler, Vice President, Director of Management at Penmark Realty, to be her assistant. ¶ 21. Penmark Realty was a building and property management company. ¶ 22. There was no written job description for the position, and the only person Winkler interviewed was Plaintiff. ¶ 23. There was no formal training for the role, and instead Winkler instructed Plaintiff on whatever tasks she wanted done as they came up. ¶ 96. Winkler closely supervised Plaintiff, and no decision could be made by Plaintiff without being cleared by Winkler. ¶¶ 90, 91.

Plaintiff's starting pay worked out to around $62,000 or $63,000 annually. ¶ 50; Ex. 15. At the time of Plaintiff's hire, Winkler did not tell Plaintiff what her expected work hours would be, nor whether her "salary" was meant to compensate her for all hours worked, including hours over 40. ¶ 28, 30. Plaintiff expected that her pay was based on her working typical business hours, or roughly from 9:00AM to 5:00PM, Mondays through Fridays. ¶¶ 29, 40. Winkler and Plaintiff also did not discuss whether Plaintiff would be eligible for overtime. ¶ 30. None of the

---

[4]    With regard to the evidence establishing the material facts on which this motion is based, Plaintiff respectfully refers the Court to her Rule 56.1 Counter-Statement of Facts in Response to Defendants' Statement of Undisputed Facts, and her Statement of Undisputed Facts in Support of Plaintiff's Cross-Motion for Summary Judgment ("Plaintiff's 56.1"). Paragraphs from Plaintiff's 56.1 will be referred to herein as "¶ ___."

many individuals who had served as Winkler's assistant had ever been paid overtime or classified as overtime eligible/non-exempt.  ¶ 32.

Shortly after Plaintiff began work, her duties and responsibilities expanded beyond being Winkler's assistant.  ¶¶ 38-39.  Days into her employment, Plaintiff was introduced to a Property Manager named Karen Dooley, and told that she also was to serve as Ms. Dooley's Assistant Property Manager (or APM).[5]  Id.  APMs supported and assisted Property Managers, who were responsible for managing and administering the management accounts of different buildings/properties.  ¶¶ 74, 80.  Plaintiff was later also asked to perform basic clerical office-related tasks, as Winkler saw fit, such as taking ordering office and kitchen supplies.  ¶ 89.

## II.   Halstead Management Purchases the Assets of Penmark Realty

A few months after Plaintiff was hired, Halstead purchased the building management-related assets of Penmark Realty, and formed a company called Penmark Management, LLC ("Penmark").  ¶ 43.  Plaintiff was issued an offer letter from Penmark dated December 21, 2009 which was signed by Judy Caplan, Senior Vice President, Human Resources for Brown Harris Stevens Residential Management LLC.  ¶ 49; Ex. 15.  The offer letter stated that Plaintiff was being hired to be Leslie Winkler's "Administrative Assistant" and "Office Manager," and that she would take on tasks as assigned by Ms. Winkler.  Ex. 15.  There was no written job description.  The offer letter mentioned Plaintiff's "base compensation," but did not state whether Plaintiff was overtime-eligible, or what Plaintiff's expected work hours would be.  Id.

At the time, Paul Gottsegen was (and remains) President of Halstead.  ¶ 9.  Martha Goupit was and remains a Senior Vice President at Halstead.  Id.  A woman named "Helene" had served in the role of Penmark Realty's "office manager" before the Halstead acquisition, but

---

[5]      APMs were colloquially referred to around the office simply as "Assistants," even though a number of Defendants' executive-level employees had personal assistants some of whom also served a dual-function as an APM.  ¶ 68.

remained with Penmark Realty.  ¶ 55.  Winkler then asked Plaintiff to take on office-related clerical tasks that Helene had performed, although, importantly, Plaintiff did not take over Helene's responsibility for screening job applicants for office positions.  ¶ 56.  In fact, Plaintiff never performed the function of screening job applicants for such positions.  ¶ 57.

At the time of the acquisition, and for the next two years, Denise Budzick served as Halstead's "office manager."  ¶ 58.  Ms. Budzick, who also served as Paul Gottsegen's assistant and an APM, was overtime-eligible. ¶ 59.  In or about mid-2012, as Penmark and Halstead became more integrated and functioned as one company, a number of Ms. Budzick's "office manager" responsibilities were handed over to Plaintiff, including responsibility for transitioning new accounts from other management companies to Halstead, and transferring existing accounts to other management companies. ¶ 60.

## III.    <u>Plaintiff's Primary Duty as an Assistant Property Manager</u>

There is no dispute that Plaintiff spent around 50% of her time, and sometimes more, performing the duties and functions of an Assistant Property Manager ("APM").  ¶ 73.  Plaintiff consistently served as the APM for five to eight different buildings at a time, and these were generally some of the more complicated and demanding buildings in the Halstead/Penmark portfolio.  ¶ 76.  Plaintiff also would be tasked with covering additional buildings when an APM left the Company, which happened frequently, until a replacement was hired.  ¶ 86.  Halstead even represented to the outside world that Plaintiff was one of their "Assistant Property Managers" via various websites it controlled.  ¶ 70; Exs. 28, 29.  A truncated list of what Plaintiff, like all other APMs, was responsible for is below, with a more fulsome list is provided in Plaintiff's 56.1:

- Assisting and supporting multiple Property Managers at a time as needed, including answering phones, taking messages, setting up appointments and setting up meetings;
- Drafting letters and other documents at the request of Property Managers;
- Filling out and preparing forms and reports pursuant to specifications and directions of Property Managers;
- Attending property board meetings when requested by and to support Property Managers;
- Taking notes/minutes during and memorializing building meetings;
- Directing concerns of residents to Property Managers, and addressing minor concerns/questions where possible;
- Preparing and reviewing tenant receivables for arrears;
- Preparing and distributing memos, notices and other correspondence to residents, as per the Property Manager's instructions;
- Receiving and processing requests for apartment alterations/decorations; and
- Assisting Property Managers with day-to-day operations of running their assigned buildings.

¶ 80.

These duties and responsibilities, while time consuming, were rote, repetitive and mechanical, governed largely by pre-established guidelines and procedures, and involved no independent judgment or discretion regarding matters of true significance. Crucially, Defendants themselves classified the APM position as an overtime eligible position, as noted in a job description circulated right before Plaintiff's departure from the Company. ¶ 67; Ex. 27.

## IV.   Plaintiff's Duties and Responsibilities as Assistant to Leslie Winkler and To a Lesser Extent Paul Gottsegen and Martha Goupit

Plaintiff also spent up to approximately 35% of her time working as the assistant to Leslie Winkler (and, later in her tenure, assistant to Paul Gottsegen and Martha Goupit). ¶ 88. An abridged list of the predominant duties and responsibilities in this role is contained below, with the full list appearing in Plaintiff's 56.1:

- Typing up/transcribing notes, including handwritten notes;

- Filling out and/or preparing documents, letters, invoices and forms pursuant to specifications and directions of executives, including, but not limited to, Schedule A and Schedule B tax forms;
- Answering/screening/returning/forwarding phone calls/voicemails;
- Taking notes during and memorializing meetings attended with and the request of executive;
- Communicating with executives regarding office activities and developments;
- Advising executives of new business referrals and leads that come in to office;
- Attending meetings, including new business meetings, in support capacity upon request; and
- Assisting with preparation for meetings, including organizing food catering for meetings, and preparing packages to be distributed at meetings.

¶ 89.

These Assistant duties and responsibilities, while time-consuming, did not require exercising discretion or independent judgment regarding matters of significance. ¶¶ 90, 98. Ms. Winkler conceded at her deposition that she closely supervised Plaintiff in these duties. ¶ 91. Mr. Gottsegen succinctly summed up what Plaintiff did for Ms. Winkler as essentially "filling in forms." ¶ 101. Plaintiff had no discretion regarding the information, data or formulae entered into the spreadsheets and other documents she prepared for Ms. Winkler. ¶¶ 106-107. Plaintiff had no discretion to deviate from Ms. Winkler's directions, and Ms. Winkler would even closely check what Plaintiff prepared. ¶¶ 105, 107. To the extent a client asked for modifications to documents, Plaintiff always had to run it by Ms. Winkler or others before making any changes. ¶ 109. Plaintiff never attended business meetings on her own, but attended in a support capacity to take notes, answer procedural questions she might be able to answer from her experience, and record any further directions. ¶ 110.

## V.   **Plaintiff's "Office Manager" Clerical Duties**

Plaintiff also was dubbed an "Office Manager" at the Company. ¶ 113. In that role, she

performed office-related clerical work (most, if not all, of which were previously performed by Denise Budzick, who was overtime eligible), taking up the remaining approximately 15% of Plaintiff's time at work.  ¶ 119.  Her "Office Manager" duties largely consisted of the following (a more fulsome list is provided in Plaintiff's 56.1):

- Maintaining and updating employee attendance and time off request records;
- Providing information regarding employee attendance records to Human Resources and Company executives as requested or pursuant to established policies/procedures;
- Ordering office and kitchen supplies from pre-approved vendors, subject to the approval of Company executives/managers for large orders;
- Coordinating office equipment repair services;
- Scheduling staff meetings, and sending out invites and attendance reminders;
- Distributing Company announcements and notices via email and interoffice memos to staff;
- Cleaning the office, including kitchen;
- Coordinating transitioning of building management companies;
- Checking in with certain employees regarding their whereabouts if they do not report to work or cannot be located;
- Providing support as requested in hiring, staffing, firing and training of employees, in coordination with Human Resources and Company executives;
- Assisting in acclimating new employees, such as by coordinating the set-up of computers, telephones and office/desk space;
- Coordinating coverage of the front desk/reception by APMs, including herself, when the receptionist was absent or on a lunch break;
- Bringing questions received from staff regarding employee policies and practices, such as attendance/vacation and medical leave, to Human Resources or executives.

Id.

Plaintiff performed a wide range of office-related tasks, but most were clerical and rote or standard in nature, and the tasks did not require the exercise of discretion or independent

judgment on matters of significance, and were usually confined by guidelines and procedures. ¶¶ 122, 125.

**VI.**    **Plaintiff Helped Coordinate, But Did Not Supervise, APMs**

Halstead/Penmark employed around 15 APMs at any given time.  ¶ 156.  The APM position was classified as overtime non-exempt.  ¶ 67; Ex. 27.  An APM's salary ranged from about $50,000 to $56,000 per year, and Mr. Gottsegen proposed moving APM salaries to $56,000 across the board to align with the market.  ¶ 277; Ex. 28.  Plaintiff did not hire, fire, evaluate the performance of or discipline APMs.  ¶¶ 169, 180, 191, 192, 204- 208, 213, 215. Many APMs were hired and/or fired during Plaintiff's tenure without her knowledge.  See ¶ 177, 179.  Plaintiff also did not set the work hours of or assign work to APMs, nor did her benefits differ from those of other APMs (even in terms of, say, more paid time off).  ¶¶ 200, 217.

The several examples Defendants may muster of Plaintiff providing irregular and incidental assistance to Company management in coordinating APMs do not approach a meaningful portion of Plaintiff's work time, nor any plausible finding that she was a "manager" and that these were her "primary" duties.  Plaintiff does recall being asked to sit in on one APM job interview, which occurred during the last year of her employment. ¶ 170.  That candidate was hired even though Plaintiff expressed a negative opinion on the interview.  ¶ 171.  On a handful of occasions, Plaintiff was shown the resume of an APM job candidate and asked whether she knew the candidate and/or the candidate seemed to be a good fit based on the resume or cover letter.  Plaintiff's opinions were often disregarded.  ¶¶ 172-173, 175-176.  Plaintiff had no involvement with any compensation-related decisions regarding an APM.  ¶ 184.  While Plaintiff may have spoken to APMs or drafted a few performance write-ups, this would be at the direction and authorization of Human Resources and/or her supervisors. ¶ 191.  From time to time,

Plaintiff would be told of new policies or procedures affecting APMs, and would schedule one to three APM meetings a year to inform APMs of the new policies or procedures.  ¶ 182. Plaintiff's supervisors, and sometimes Human Resources employees, would also attend these meetings, and any agenda prepared by Plaintiff would be vetted by her supervisors beforehand. ¶ 183.  When a new APM joined, Plaintiff and other APMs would go over policies and procedures governing APMs.  ¶ 162-164, 203.  Plaintiff was not a "supervisor" to any APM or other employee.  ¶ 157-217.

Plaintiff would put together a schedule for APMs (chosen essentially at random or by availability) to rotate and cover the front desk for receptionists' lunch break and absences, and Plaintiff also would regularly be assigned to sit at the front desk.  ¶ 218.  Plaintiff had no authority to approve or deny requests for time off, and such authority rested with Human Resources and her supervisors. ¶¶ 130-132.  Employees who asked for time off and were eligible for it (and had arranged coverage) would have their requests passed on to supervisors by Plaintiff.  ¶¶ 133-134.  Plaintiff also would pass along issues that APMs made her aware of to Human Resources or her supervisors, but would not do anything in response unless authorized to do so.  ¶¶ 186-187.  Most of the time, APMs were directed or went directly to Human Resources. See ¶¶ 188-190.

Plaintiff also had no involvement or influence regarding APM headcount, and all requests she made that more APMs be hired were rejected by Terra Holdings's COO, Alan Kersner.  ¶¶ 193-196.

**VII.    Plaintiff Did Not Supervise Front Desk Receptionists**

At any one time, there was only one front desk receptionist working at Halstead/Penmark.  ¶ 220.  Human Resources would contact a temporary staffing agency for

11

potential candidates to fill a vacancy in the position.  ¶ 222.  In some years, the Company would go through as many as four to six different receptionists.  ¶ 221.  Human Resources employees would meet with and/or screen the agency's candidates.  ¶ 223.  Sometimes a candidate who passed this phase would be directly placed in the front desk receptionist position, while at other times, candidates who pass the screening phase would be passed on to Plaintiff to meet.  Id. Plaintiff could recommend whether or not to bring aboard a candidate, but her suggestion could be vetoed by supervisors.  ¶ 224.

During a receptionist's 90-day probationary period, Plaintiff and others would provide input as to whether the person should be given a permanent, full-time offer.  The ultimate decision whether to extend a full-time offer rested with Plaintiff's supervisors and the Human Resources department.  ¶¶ 224-225.  Any APM could pass work to the front desk receptionist.  ¶ 227.  Plaintiff had no involvement in the termination of the many front desk receptionists who were fired.  ¶ 232.

## VIII.   Plaintiff Repeatedly Raises Concerns About Her Erroneous Overtime-Exempt Classification, But Is Rebuffed by the Company Each Time

Plaintiff had numerous communications with her supervisor, Leslie Winkler, in which she raised her concerns about her classification as overtime-exempt, but was rebuffed each time. ¶¶ 234-237.  Indeed, during a 2011/2012 on-site labor law presentation by lawyers from the Jackson Lewis law firm and Human Resources that was attended by Plaintiff, Ms. Winkler and many others, Plaintiff learned that an employee's duties and responsibilities (not job title) determine overtime eligibility, and that employers must explain an employee's overtime classification if she asks.  ¶¶ 238-239.  During the presentation, Plaintiff sent a text message to Ms. Winkler, who was across the room, saying she believed she should be eligible for overtime, to which Ms. Winkler responded "why?," to which Plaintiff wrote, in substance, "listen to the

presentation.  Jackson Lewis is saying I am eligible for overtime."  ¶¶ 240-241.  Yet, Ms.

Winkler immediately shook her head "no" at Ms. Babayeva from across the room, and never

followed up with her regarding her classification.  ¶ 242.

## IX.   There Is No Credible Evidence that Defendants Took Any Action to Determine Plaintiff's Correct Overtime Classification

Plaintiff was never asked to prepare a job description or any other document for purposes

of determining her correct overtime classification.  ¶ 245.  Likewise, at no point did any

employee or agent of Defendants ever meet with Plaintiff to discuss her duties and

responsibilities to determine her correct overtime status.  ¶¶ 246-247.  There is no creditable

evidence in the record that Defendants took any reasonable steps to ensure that Plaintiff was in

fact an overtime-exempt employee based on her duties and responsibilities.  ¶ 250-268.

In fact, Leslie Winkler testified that she simply believed that no person who served as her

assistant could be eligible for overtime.  ¶ 256-258, 32.  Paul Gottsegen, Halstead's President,

testified that he did not even know Plaintiff's overtime classification until this lawsuit, and

would assume that the Payroll/Human Resources department correctly classified Plaintiff.  ¶¶

266-268.  Judy Caplan, the Company's highest-ranking HR executive, testified that although she

never looked into whether Plaintiff was correctly classified for overtime purposes herself, she

was sure that an employee of hers (whom she could not identify) worked with Plaintiff's

supervisor, Ms. Winkler, to determine Plaintiff's correct overtime classification.  ¶¶ 260-264.  Of

course, Ms. Winkler vitiated even this testimony by Ms. Caplan by testifying that she was never

approached by HR or anyone else about determining Plaintiff's correct overtime classification.

¶¶ 250-258.  It is abundantly clear from this unsupported and contradictory testimony that no

genuine effort was made to review whether Leslie Winkler's initial kneejerk decision to classify

Plaintiff as overtime-exempt was correct.

**X.**     **Plaintiff's Compensation in Comparison to that of Non-Exempt APMs**

Between 2009 and 2015, Plaintiff's annual compensation ranged from about $63,000 to about $75,000.  ¶ 280.  The annual salary for APMs, who are <u>eligible</u> to receive overtime pay, has ranged between $50,000 and $56,000.  ¶ 276.  In March 2016, Mr. Gottsegen recommended standardizing all APMs at a $56,000 annual salary to align with the market.  ¶ 277; Ex. 28. Plaintiff served as APM on between 5 and 8 buildings at any given time, which included some of the largest buildings the Company managed, including 80 Riverside which had 271 apartments, and 100 Riverside which had 266 units.  ¶ 76.  Full-time APMs would typically have between 7 and 11 buildings in their portfolio, while some could have as much as 18.  ¶ 77.  However, the amount of work an APM would have on their plate was less determined by the number of buildings in their portfolio, but more by the amount of apartments or units in those buildings, and how active the building was in terms of rentals, move-ins, etc.  ¶ 78.  As such, Plaintiff was consistently one of the busiest APMs, in addition to her duties and responsibilities as Assistant to Leslie Winkler, Paul Gottsegen and Martha Goupit, and "Office Manager," (although the title was a misnomer).  ¶ 79.

**XI.**    **Plaintiff Resigned and Defendants Hired Kristen Olmsted to Replace Her**

Plaintiff resigned her employment, effective April 2016.  ¶ 281.  Defendants hired Kristen Olmsted to effectively replace Plaintiff, gave her the title of "Director of Office Management and Operations," and classified her as overtime exempt.  ¶ 282.  Ms. Olmsted worked for approximately four months before being terminated in August 2016.  ¶ 282.  Ms. Olmsted estimates that she spent upwards of 75% of her time at work performing the APM function, and the bulk of her remaining time performing "file-clerk type" clerical work.  ¶ 283.

Ms. Olmsted has not been replaced since her termination.  Defendants contend that there currently is no one who "supervises" APMs.  ¶ 285.

**XII.    Terra Holdings Jointly Controlled Plaintiff's Employment and Was Effectively a Joint or Single Employer with the Other Halstead/Penmark Entities**

Terra Holdings owns a number of real estate service companies that primarily operate under the Brown Harris Stevens and Halstead brands.  ¶ 286.  Terra Holdings's principal place of business, like that of Brown Harris Stevens and Halstead, is at 770 Lexington Avenue.  ¶ 287. The owners of Terra Holdings own a majority stake in 770 Lexington Associates, LLC, which owns the 770 Lexington Avenue building.  ¶ 288.

Terra Holdings provides back-office operations to Halstead and Brown Harris Stevens, including mailroom, IT, legal, accounting, payroll and human resources.  ¶ 289.  Terra Holdings also provides insurance coverage to Halstead and Brown Harris Stevens.  ¶ 290.  Terra Holdings's Chief Operating Officer, Alan Kersner, has oversight over all Terra entities.  ¶ 291. Judith Caplan reports to Mr. Kersner.  ¶ 292.  The owners of Terra Holdings set policies for Terra Holdings and all of Terra Holdings's subordinate entities.  ¶ 293.  Employment-related matters are handled by the Terra Holdings-provided Human Resources function.  ¶ 294.  During Plaintiff's employment, employees were shifted between Terra-owned companies, including an employee named Lashana Desmartes, who was freely moved from being a front desk receptionist for the Brown Harris Stevens entity to becoming an APM at Halstead.  ¶¶ 295, 302.

In December 2009, after Halstead acquired assets of Penmark Realty, Plaintiff signed Terra Holdings's Code of Conduct, which contained numerous employment policies.  ¶ 297: Ex. 33.  On a document entitled "Terra Holdings Application for Employment," Plaintiff was asked whether she would be "willing to work overtime as necessary," and she checked the "yes" box. ¶ 298.  Plaintiff also twice signed a document entitled "Terra Holdings Employee Benefit

Confirmation and Waiver Form," in November 2011 and November 2014.  ¶ 299; Ex. 34.  On

about four to five different occasions, Plaintiff was asked to and did take on certain projects from

David Burris, a Principal and Co-Chairman of Terra Holdings.  ¶ 300.  These projects had

nothing to do with Halstead Management, but did concern Terra Holdings, and mainly involved

construction renovation projects Mr. Burris wanted done for various floors in the 770 Lexington

Avenue building.  Id.  In addition, although Plaintiff's supervisors Leslie Winkler, Paul

Gottsegen and Martha Goupit would make recommendations regarding changes to Plaintiff's

compensation, ultimately decisions as to Plaintiff's compensation were made by "higher powers"

at Terra Holdings.  ¶ 303  Among the individuals who were a part of the discussion as to whether

to offer Plaintiff additional salary in to try to retain her after she announced that she wanted to

resign in March 2016, were Judith Caplan, David Burris, and Alan Kersner, along with Paul

Gottsegen, Leslie Winkler, Martha Goupit.  ¶ 304.  Therefore, Terra was not only closely

intertwined with Halstead/Penmark (including HR), but Terra also had significant control over

the terms and conditions of Plaintiff's employment.

## ARGUMENT

### I.    Summary Judgment Standard

Summary judgment is appropriate where the submissions of the parties, taken together,

"show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "If summary judgment is not rendered on

the whole action, the court should, to the extent practicable, determine what material facts are not

genuinely at issue."  Fed. R. Civ. P. 56(d)(1).  A party may also move for partial summary

judgment on the issue of liability, notwithstanding disputed issues of fact pertaining to the

amount of damages.  See Fed. R. Civ. P. 56(d)(2) ("An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.").

To establish a genuine issue as to the existence of a particular element, the non-moving party must point to record evidence upon which a reasonable jury could find in its favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  Id.  See also Okoro v. Marriott Int'l, Inc., No. 07 Civ. 157, 2008 WL 4449386, *4 (S.D.N.Y. Sept. 29, 2008).  Although all facts are construed in favor of the non-moving party, such party "must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-88 (1986).

Plaintiff is entitled to summary judgment regarding Defendants' liability because Defendants cannot establish that Plaintiff's work was exempt under the FLSA's exemptions.

## II.     Plaintiff Is Entitled to Summary Judgment on Defendants' Liability under the FLSA and NYLL

The FLSA mandates that no employer shall employ an employee for more than forty hours in a work week, unless that employee is compensated at one and one-half times his usual rate for hours worked in excess of forty.  See 29 U.S.C. § 207(a)(1).  Under the FLSA, certain categories of employees are exempted from the protections of the FLSA.  See generally, 29 C.F.R. § 541.  The Supreme Court has instructed courts that the exemptions to the FLSA "are to be narrowly construed against the employers seeking to assert them and their applications limited to those establishments plainly and unmistakably within their terms and spirit."  Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).  Defendants assert that Plaintiff fell under the "administrative exemption" and/or the "executive exemption."  See Defendants' March 3, 2017 Letter to the Court (Dkt. No. 54) ("Defs. March 3, 2017 Letter"), attached as Exhibit 35 to the

Declaration of Lawrence M. Pearson ("Pearson Decl."), at pp. 1.  The record shows that there is no material issue of fact regarding whether Plaintiff properly fell within, or really even came close to falling within, the administrative or executive exemptions to FLSA and NYLL overtime requirements.

### A.   Plaintiff Was Not an Exempt Administrative Employee

Plaintiff did not fall under the administrative exemption because her primary duty[6] was neither: (i) directly related to the management or general business operations of Defendants or their customers, nor (iii) involved the exercise of discretion and independent judgment with respect to matters of significance.

### i.   Background of the FLSA and Administrative Exemption

As originally enacted, the FLSA exempted from its requirements individuals employed in a "bona fide... administrative... capacity," but did not define the phrase.  29 U.S.C. § 213(a)(l)(1938).  The  administrative exemption is  designed to include only top-tier,  upper-level employees – executives who  effectively run parts of the  business, but who do not fit within the executive exemption because they supervise functions rather than other employees.  29 C.F.R.  § 541.201 et seq.  The current regulations require administrative employees to  "perform work directly related to  assisting with  the running  or  servicing of  the business,"  29 C.F.R.  § 541.201, and  to "exercise [ ]  discretion  and  independent judgment with respect to  matters of

---

[6]      "Primary duty," under the U.S. DOL's regulations, "means the principal, main, major or most important duty" of the employee, as determined based on factors such as "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee."  29 C.F.R. § 541.700.  The question of what an employee's duties are "is one of fact, but the question of whether those activities" fall into an FLSA exemption is a question of law.  Chenensky v. New York Life Ins. Co., No. 07 Civ. 11504 (WHP), 2010 WL 2710586, at *2 (S.D.N.Y. June 24, 2010).  Although the percentage of an employee's time spent performing exempt versus non-exempt work is an "important" factor, it is not dispositive.  Martinez v. Hilton Hotels Corp., 930 F. Supp. 2d 508, 523-24 (S.D.N.Y. 2013).  However, as a rule of thumb, an employee's "primary duty" means that duty which occupies the major part, or over fifty percent, of the employee's time.  Department of Labor v. City of Sapulpa, 30 F.3d 1285, 1287 (10th Cir. 1994); 29 C.F.R. § 541.103.

significance."  29 C.F.R. § 541.202.  The administrative exemption  should be narrowly

construed,  and not misapplied based on the common usage of the term "administrative" to refer

to clerical employees.

### ii.    Plaintiff's Duties Were Not "Directly Related" to General Operations

The DOL regulations elucidate the meaning of the "directly related to the

management or general business operations" part of the administrative exception:

> "The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee.   To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."

29 C.F.R. § 541.201(a).  The preamble to the DOL's 2004 regulatory revisions further

explains that the administrative exemption covers only employees "whose work involved

servicing the business itself – employees who can be described as staff rather than line

employees, or as functional heads rather than departmental heads."  69 Fed. Red 22122,

22141 (emphasis added); 29 C.F.R.  § 541.203(e) (human resources managers who formulate,

interpret or implement employment policies and protocols fall within the exemption, whereas

personnel clerks who merely carry them out do not); see also Bothell v. Phase Metrics, Inc.,

299 F.3d 1120, 1125 (9th Cir. 2002) ("This requirement is met if the employee engages in

running the business itself or determining its overall course or policies, not just in the day-

to-day carrying out of the business's affairs.") (internal quotations omitted); Davis v. J.P.

Morgan Chase & Co., 587 F.3d 529, 534-35 (2d Cir. 2009)(underwriters did not perform

work "directly related to management policies" of "general business operations," but merely

carried out their employer's day-to-day business, as they "did not have any substantial

advisory duties; had no involvement in determining the future strategy or direction of the business," and "played no role in the establishment of [their] employer's credit policy"); Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 614 (D. Conn. 2007) (describing duties directly related to the management or general business operation as those that do not involve what the day-to-day business sells or provides); Clark v. J.M. Benson Co., 789 F.2d 282, 287 (4th Cir. 1986) (holding that fact that an employee may be indispensable is insufficient as matter of law to prove that primary duty is administrative, as "The regulations emphasize the nature of the work, not its ultimate consequence."); see also Ruggeri v. Boehringer Ingelheim Pharm., Inc., 585 F. Supp. 2d 254, 264 (D. Conn. 2008) (employee who performs everyday tasks but "does not engage with the broader issues of the employer's course or policies" is not doing administrative work and must be paid overtime).

### iii. Plaintiff Performed Work that Involved Day-To-Day Business Operations, and *Not* "Administrative" Duties Running Defendants' Business

Work directly related to management or general business operations generally includes the work performed by "so-called white-collar employees engaged in 'servicing' a business, as, for example, advising the management, planning, negotiating, representing the company, purchasing, and business research and control." Cooke v. Gen. Dynamics Corp., 993 F. Supp. 56, 59 (D. Conn. 1997), citing 29 C.F.R. § 541.205(b).

There is no dispute that Plaintiff performed the Company's "line work" as an APM, and work that merely involved the day-to-day business operations of Defendants as an Assistant and so-called "Office Manager." See supra pp. 7, 21. Plaintiff serviced clients and helped maintain accounts at a basic level, and she also performed clerical work according to set guidelines and close supervision and approval. This is not materially disputed beyond a few minor tasks among

20

the vast majority of Plaintiff's duties (and even those tasks still do not meet the test).  She also did not formulate Defendants' operations policies, but "[r]ather, [was] trained only to apply the [policies] as [she] found [them], as [they were] articulated to [her]" by corporate management and her supervisors.  Davis, 587 F.3d at 525; see also Relyea v. Carman, Callahan & Ingham, LLP, No. 03 Civ. 5580 (DRH)(MLO), 2006 WL 2577829, at *5 (E.D.N.Y. 2006) ("Plaintiffs applied existing policies and procedures on a case-by-case basis.  Their duties do not involve the crafting of those policies, but rather the application of those policies.  As a result, Plaintiffs are better described as 'production,' rather than 'administrative' workers, and they are not exempt from FLSA.")

Plaintiff served in a support function, whose primary duty was to assist in the provision of building management services to Defendants' clients (which served as the core function of the services that Defendants provided to their clients), provide administrative and secretarial support to Defendants' executives, and to carry out mundane office-related clerical tasks within pre-established guidelines and procedures.  ¶¶ 97-111.

Plaintiff's primary work related to the product or service sold by Defendants – building management services, with Plaintiff, as an APM, supporting Property Managers who managed specific buildings in Defendants' portfolio.  ¶ 74.  Alternatively, as an Assistant or "Office Manager," Plaintiff also performed day-to-day support tasks, and had no genuine hand in creating policy or charting the course of the business or running one of its functions.  ¶ 119-155.  Therefore, Plaintiff's primary was not "administrative" for purposes of the exemption.

Defendants will no doubt label some of Plaintiff's duties as "personnel management," (putting together a list of rotating APMs to fill in at reception) "purchasing/procurement" (ordering office supplies subject to approval) or other cherry-picked functional duties listed in

the DOL Regulations in order to try to fit Plaintiff into the administrative exemption.  See 29 C.F.R. § 541.201(b).  However, Defendants cannot escape the simple facts that Plaintiff's primary duty as an APM was performance of work directly related to the service that Defendants provide to their clients, or that in no way did she serve as a <u>functional head</u> in her other duties.

The FLSA is a remedial law, and therefore the administrative exemption is to be <u>narrowly construed against Defendants</u>, and its application limited to those situations where the work performed was <u>plainly and unmistakably</u> within the administrative exemption.  <u>See</u> <u>Arnold</u>, 361 U.S. at 392.  This is why summary judgment in favor of wage-hour plaintiffs such as Ms. Babayeva may be less difficult to achieve than under most employment claims.  Defendants cannot present a <u>material</u> factual dispute that Plaintiff's duties fell within the administrative exemption, and therefore summary judgment should be granted as to their liability.

### iv.    Plaintiff's Primary Duty Did Not Involve the Exercise of Independent Judgment and Discretion with Respect to Matters of Significance

Under the administrative exemption, a worker is exempt from the FLSA's overtime provisions only if her primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  <u>See</u> 29 C.F.R. § 541.200.[7]  The discretion and independent judgment generally refers to decisions normally made by people who formulate policy within their area of responsibility, who participate in this process, or who exercise authority to commit the employer in a substantial respect.  <u>See</u> 29 C.F.R. § 541.207(d)(2) (emphasis added).

The Regulations provide the following factors for consideration as part of this analysis:

---

[7]        "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," while "[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).  The discretion must be "real and substantial, that is ... exercised with respect to matters of consequence."  29 C.F.R. § 541.207(d)(1).

- whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

- whether the employee carries out major assignments in conducting the operations of the business;

- whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

- whether the employee has authority to commit the employer in matters that have significant financial impact;

- whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

- whether the employee has authority to negotiate and bind the company on significant matters;

- whether the employee provides consultation or expert advice to management;

- whether the employee is involved in planning long- or short-term business objectives;

- whether the employee investigates and resolves matters of significance on behalf of management; and

- whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

See 29 C.F.R. § 541.202(b).

These factors do not apply to Plaintiff's work in any substantial way. The regulations caution that discretion and independent judgment is more than "the use of skill in applying well-established techniques." 29 C.F.R. §541.202(e). Because "almost every employee is required to use some discretion and independent judgment," 29 C.F.R. §541.207(d)(l) (emphasis added), "[i]t is not enough to merely latch on to words like 'decision,' 'recommendation,' 'judgment,' or 'determine' that might appear in descriptions of an employee's work." Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 405 (6th Cir. 2004). Yet, we expect that this is precisely what Defendants will do, when in fact they must establish that Plaintiff "ha[d] the authority or power

to make an independent choice, free from immediate direction or supervision and with respect to matters of significance" in performing her primary work duty.  Phase Metrics, 299 F.3d at 1129.

The record is devoid of examples of Plaintiff being involved in the planning of Defendants' long- and short-term objectives, or of Plaintiff playing any role whatsoever in formulating policies and procedures that affected Defendants' business, or showing any "major assignment" that affected business operations or made commitments having a significant financial impact.  Plaintiff had to obtain express approval to order new office machinery, and could only order office and kitchen supplies from pre-approved vendors.  ¶ 123-125.[9]

For instance, when she prepared Schedule A and B forms, Plaintiff filled out pre-existing forms with information, data and formulas provided to her by others – she did not determine what the data would be, and to the extent modifications were requested by clients, Plaintiff had to run everything past Ms. Winkler.  ¶¶ 103-107; Ex. 23.  See Ebert v. Holiday Inn, No. 11 Civ. 4102 (ER), 2014 WL 349640, at *11–12 (S.D.N.Y. Jan.31, 2014) (employee non-exempt where his "primary duties involved [inter alia] preparing standard reports [and] performing data entry tasks").[10]  Plaintiff also did not have authority to render decisions that deviated from personnel policies, such as for time off requests, but was required to defer to her supervisors and Human Resources when a request might have fallen outside the policy.  ¶¶ 129-133.  Further, such matters cannot plausibly be said to be of true material "significance."  See Ale v. Tennessee Valley Auth., 269 F.3d 680, 690 (6th Cir. 2001) (limited authority to direct activities of other

---

[9]     And, the DOL's guidelines specify that "[o]rdering routine office supplies (papers, pens, notebooks, post-its, etc.)" is a non-exempt clerical function that does not meet the administrative exemption test.  See U.S. Dep't of Labor Wage & Hour Div., FIELD OPERATIONS HANDBOOK (2016) at § 22c04(f).

[10]     See also Rainey v. Am. Forest & Paper Ass'n, Inc., 26 F. Supp. 2d 82, 89 (D.D.C. 1998) (finding, as a matter of law, that "assisting the senior director in creating reports, spreadsheets, and special projects, including with regard to work with outside consultants and for preparation for audits and investigations," "while perhaps related to management policies that may have been carried out in conjunction with management personnel," did not require discretion and independent judgment, as it was merely carrying out supervisor instructions).

employees, such as discretion to allow a sick officer to man a post near bathroom, insufficient to render employee administratively exempt because they do not involve matters of significance).

Defendants will very likely try to rely upon certain *descriptions* of some duties Plaintiff had during her seven-year tenure, such as: "Trained all new APM's on Halstead procedures," "provide general counseling and write up's when needed while working with HR to meet all requirements," "Update the APM job description as needed," "make sure all APMs are at their seat and working before 9:15AM," "Prepare agenda's for APM meetings - solicit agenda topics as well as coordinate any training sessions as needed," "Meeting with APMs on general office issues/procedures," and "Update the APM staff coverage schedule as needed." See Defendants' March 13, 2017 Letter to the Court (Dkt. No. 57) ("Defs. March 13, 2017 Letter"), attached as Exhibit 57 to the Pearson Decl., at 2, fn.4.   These descriptions from memoranda prepared by third parties, or from Plaintiff's resume (geared, as everyone's is, to advocate on behalf of herself) still do not create an issue that Plaintiff exercised independent judgment and discretion regarding matters of significance to Defendants' management or general business operations. See Rainey, 26 F. Supp. 2d at 89 (conducting employee orientations consisting of handing out copies of company policies and procedures, reading them with new employees, obtaining employees' signature to indicate receipt, and answering questions "could not have entailed 'the comparison and the evaluation of possible courses of conduct' and acting or making a decision after the various possibilities have been considers," and, as a matter of law, "did not require the exercise of discretion or independent judgment"); Ale, 269 F.3d at 690 (training that involved "very specific procedures [does] not involve discretion or judgment" to qualify as exempt administrative duty).

Defendants cannot present a material fact issue that Plaintiff exercised discretion and independent judgment regarding matters of significance.  Plaintiff should be found, as a matter of law, not to have fallen within the "administrative" exemption during her employment.

**B.      Plaintiff Also Is Entitled to Summary Judgment on the "Executive" Exemption**

It is undisputed that, while Plaintiff was once told during her employment that she was supposedly an exempt "administrative" employee, at no point during Plaintiff's employment was she told that she was overtime-exempt under the "executive" exemption.  ¶ 271.  Defendants glaringly now seek to invoke this exemption in post hoc fashion in a futile bid to avoid liability for failure to pay overtime.  Notwithstanding the fact that Defendants are arguably estopped from asserting this exemption, there is no support for applying this exemption to Plaintiff.

**i.      Relevant Law and Regulations**

The so-called "executive" exemption applies to an "employee employed in a bona fide executive capacity...[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof … [w]ho customarily and regularly directs the work of two or more other employees; and … [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a).  The evidence conclusively shows that: (i) Plaintiff's primary duties did not consist of the management of Defendants' enterprise or a department or subdivision thereof; (ii) she did not customarily and regularly direct the work of two or more employees (or any employees for that matter); (iii) she did not have the authority to hire or fire employees; and (iv) any suggestions and recommendations as to personnel that she

26

may at times have made were not given any particular weight.[11]  All of this rules out the
"executive" exemption.

The regulations caution against an inordinate focus on an individual's job title (e.g.,
"Office Manager"), stating that this "alone is insufficient to establish the exempt status of an
employee."  29 C.F.R. § 541.2.  In addition, the regulations require that the employee's "primary
duty" be management, 29 C.F.R. § 541.100(a)(2), explaining that:

> "a relief supervisor or working supervisor whose primary duty is
> performing nonexempt work on the production line in a
> manufacturing plant does not become exempt merely because the
> nonexempt production line employee occasionally has some
> responsibility for directing the work of other nonexempt
> production line employees when, for example, the exempt
> supervisor is unavailable."  29 C.F.R. § 541.106(c).

Moreover, an exempt "executive" employee must "customarily and regularly direct[ ] the
work of two or more other employees" in order to qualify as an exempt executive.  29 C.F.R.
541.100(a)(3).  The phrase "customarily and regularly" means "a frequency that must be greater
than occasional but which, of course, may be less than constant.  Tasks or work performed
'customarily and regularly' include work normally and recurrently performed every workweek;
it does not include isolated or one-time tasks."  29 C.F.R. § 541.701.  This does not mean to
direct employees in some small aspect of their work (otherwise, Defendants could argue that
merely compiling a reception desk coverage list means that Plaintiff supervises all of her fellow
APMs), but rather supervising the employees in their terms and conditions of employment.  See

---

[11]     "Management" typically includes activities such as interviewing, selecting and training employees; setting
and adjusting rates of pay and hours of work; directing the work of employees; maintaining production or sales
records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of
recommending promotions or other changes in status; handling employee complaints and grievances; disciplining
employees; determining work techniques; apportioning work among the employees; determining the type of
materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold;
controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security
of the employees or the property; planning and controlling the budget; and monitoring or implementing legal
compliance.  See 29 C.F.R. § 541.102.  The record shows that Plaintiff's primary duties did not, in fact, entail such
activities.

<u>Ale</u>, 269 F.3d at 692 (finding, as a matter of law, that shift supervisors who did not set or adjust hours of work, determine employees' posts, or train employees, were not exempt managers, as they had no control over the people they "supervised," nor was supervision their primary duty).

Whether an employer gives "particular weight" to an employee's recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees depends on "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Again, this indisputably does not apply to Plaintiff.

### ii.    Plaintiff's Primary Duty Was Not Managerial

The DOL regulations define "primary duty" as: "The principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). To determine an employee's primary duty, the DOL directs employers to consider: (1) the amount of time spent on exempt versus non- exempt work; (2) the employee's relative freedom from direct supervision; (3) the relative importance of the exempt duties as compared with the employee's other duties; and (4) the difference between the employee's salary and the pay typically offered for the types of non-exempt work performed by the employee. <u>Id.</u> Here, Plaintiff spent the vast majority of her time on non-exempt tasks (with a few minor tasks that Defendants will argue might be viewed as exempt or managerial in nature, which in fact are not). She was closely supervised and restricted by corporate policies and guidelines, and effectively earned *less* than her non-exempt co-workers, who she was not in reality "managing."

a.      Plaintiff Spent the Vast Majority of Her Time on Non-Exempt
        Work

The amount of time an employee spends performing exempt versus non-exempt

work is an important factor in determining whether the employee qualifies under the executive

exemption to the FLSA.  See Martinez, 930 F. Supp. 2d at 524.  The undisputed evidence

shows that she spent the vast majority of her time on non-exempt duties alongside her non-

exempt co-workers, such as the duties of an APM (50% of her time), serving as Assistant to

three of Defendants' executives (35% of her time), and performing office-related clerical

work (15% of her time).  There is no evidence in the record contradicting the

overwhelming proportion of time Ms. Babayeva spent in "hourly" versus the duties

Defendants will try to argue were "managerial" activities.

b.      Plaintiff Was Closely Supervised by Her Managers

Even when an employee does perform some managerial tasks, she may still be non-

exempt if she "do[es] so largely pursuant to the dictates of immutable corporate policy or at the

behest of the Manager to whom they report."  Carhuapoma v. N.Y.-Presbyterian Healthcare Sys.,

Inc., No. 11 Civ. 8670 (JPO)(RLE), 2013 WL 1285295, at *10 (S.D.N.Y. Mar. 29, 2013)

(quoting Clougher v. Home Depot U.S.A., Inc., 696 F. Supp. 2d 285, 288 (E.D.N.Y. 2010)).

Leslie Winkler admitted at her deposition that she closely supervised Plaintiff, along with Paul

Gottsegen and Martha Goupit, and that Plaintiff did not do much without Winkler's involvement.

¶¶ 90-91.  Plaintiff also was restricted by corporate policies, which she did not formulate, and

was not free to deviate from them.  ¶ 97.  As the Clougher court explained, "Both freedom from

supervision and the exercise of discretionary authority contemplate decisions of the kind and

quality normally made by persons formulating policy within their spheres of responsibility, or

who participate in this process, or who exercise authority to commit the employer in a substantial

respect, financial, or otherwise." Clougher, 696 F. Supp. 2d at 292.  Plaintiff was not primarily

engaged in any arguably "managerial" work.

> c.      Plaintiff's Non-Exempt Duties Were More Important Than Any of
> Her Even Arguably Exempt Duties, Which Were Minor

The relative importance of an employee's exempt and non-exempt duties in their

employment can be critical to determining if an employee's primary work is managerial.  See

Indergit v. Rite Aid Corp., No. 08 Civ. 11364 (PGG), 2010 WL 1327242, at *6 (S.D.N.Y. Mar.

31, 2010).  The extent to which allegedly "managerial" tasks are also performed by

lower-level non-exempt employees also can show whether an employee is properly

classified as exempt.  Costello v. Home Depot USA, Inc., 928 F. Supp. 2d at 473, 495 (D.

Conn. 2013).  Many of the Plaintiff's allegedly "managerial" duties were also performed by

non-exempt co-workers.  For instance, other APMs had the authority to assign work to the front

desk receptionist.  ¶ 227.  Other APMs also provided input as to whether a receptionist should be

retained after a 90-day probationary period.  ¶ 225.  Other APMs also were involved in

"training" new APMs in the same way as Plaintiff – helping them become familiar with

Company procedures and policies and job duties.  ¶ 228.  As such, Plaintiff was an "Office

*Manager*" in name only or in the least significant sense.  Indeed, "The words 'in charge' or

'highest ranked' are not…a magical incantation that render an employee a bona fide executive

regardless of his actual duties."  Indergit, 2010 WL 1327242, *7 (quoting Ale, 269 F.3d at 691

(internal quotations omitted).

> d.      Plaintiff's Effective Wages Were Less Than Those of Her Non-
> Exempt Co-Workers, Who She Was Supposedly Supervising

The fourth factor regarding whether an employee's "primary duty" is managerial is the

difference between the employee's salary and wages paid to non-exempt employees for similar

work.  Martinez, 930 F. Supp. 2d at 525-26 (citing 29 C.F.R. § 541.700(a)).  An assistant who is

closely supervised and earns little more than non-exempt employees generally is not exempt. See 29 C.F.R. § 541.700(c).  To determine the difference between the pay of exempt and non-exempt workers, "courts reduce the exempt employee's weekly salary to an hourly rate of pay by dividing the salary by the number of actual hours worked, and then compare that hourly rate to the hourly rate of subordinate employees."  Carhuapoma, 2013 WL 1285295, at *12.

Plaintiff received a flat salary, regardless of hours worked, and estimates that she usually worked 50 to 60 hours per week.  ¶ 273.  In 2010, Plaintiff's annual compensation from Defendants was $63,310; in 2011, her total pay was $64,768; in 2012, her total pay was $69,472; in 2013, her total pay was $74,902; in 2014, her total pay was $71,659; and in 2015, her pay was $75,086.  ¶ 280.  Plaintiff resigned effective April 2016.  Id.  On a 40-hour per week basis, her effective hourly pay rate was $30.44 per hour in 2010, $31.15/hour in 2011, $33.53/hour in 2012, $36.01/hour in 2013, $34.45/hour in 2014, and $36.10/hour in 2015.  But Plaintiff usually worked 50 hours or more in a week, so her effective hourly pay rate was: 2010 - $24.35/hour, 2011 - $24.92/hour, 2012 - $26.82/hour, 2013 - $28.80/hour, 2014 - $27.56/hour, and 2015 - $28.88/hour[12].  If Plaintiff worked 60 hours in a week, her effective hourly pay rates would range from **$20.29/hour in 2010 to $24.07/hour in 2015**.

Non-exempt APM's employed by Defendants were paid a comparable, if not higher, effective hourly rate than Plaintiff.  As of March 2016, the annual base (i.e., 40-hour) pay for APMs ranged from $50,000 to $56,000, with Mr. Gottsegen, Halstead's President, proposing that all APM salaries be raised to $56,000 so APM salaries would be market-competitive.  ¶ 277; Ex. 28.  At the low end, the effective hourly rate for this position, over a forty-hour week,

---

[12]     To calculate the effective hourly rate per year, we simply divided the total compensation by 52 weeks in a year and divided by the relevant work hours per week.

was **$24.04**, and at a high end, **$26.92/hour**, which is $36.06 to $40.38 at the one-and-one-half overtime rate.

Plaintiff was therefore paid comparably to and even <u>less than</u> her hourly co-workers by many measures (i.e., if they worked fewer hours than Plaintiff).  It is clear Plaintiff's "exempt" status was saving the Company money on her work.  <u>See</u> <u>Martinez</u>, 930 F. Supp. 2d at 526.

### iii.    Plaintiff Did Not Have the Authority to Hire or Fire

The record is devoid of credible, objective and specific evidence that Plaintiff had the authority to hire or fire, or that her recommendations were given particular weight. <u>See</u> 29 C.F.R. § 541.700(a); <u>Costello</u>, 928 F. Supp. 2d at 488.  In <u>Costello</u>, the court refused to find plaintiff to be overtime exempt as a matter of law, despite evidence that the plaintiff conducted <u>over 200</u> interviews, had input into raises and promotions for subordinates, and testified that his recommendations were followed 90% of the time.  <u>Costello</u>, 928 F. Supp. 2d at 489.  The court noted that defendants provided no evidence, such as an affidavit, as to whether plaintiff's recommendations "actually had an impact on those receiving them."  <u>Id.</u>

Here, there is no evidence to support a finding that Plaintiff ever had authority to hire or fire employees, or that Plaintiff's recommendations (i.e., the "handful" of times over her near seven-year employment in which she was specifically asked to provide an opinion on a candidate who had already been screened and even interviewed by executives (¶¶ 165-166)) were given particular weight.  Plaintiff testified that she sometimes took part in the "interview process" for APM candidates in one of two ways: either (i) she would be asked to provide input on a candidate based on her review of the candidate's resume (which entailed little more than seeing if the candidate had relevant real estate or office experience), or whether she personally knew the candidate, or (ii) she would interview a candidate if asked, usually with an executive present.

Plaintiff would not take the initiative or interview APM candidates alone, never volunteered her opinion, was not involved in screening of candidates, and was not involved in final decision-making.  ¶ 166-169.  In fact, Plaintiff's opinions as to APM candidates, in those rare instances when she was asked to give one, were routinely disregarded.  Plaintiff recalled several instances when her solicited suggestions or recommendations were not given any particular weight and the Company took the opposite action she recommended.  ¶¶ 170-173, 175-176.  Additionally, APMs were routinely hired and fired during Plaintiff's tenure without her knowledge or any input.  ¶¶ 177-178.

Plaintiff did not review, much less supervise, hourly employees, and did not provide input for or attend APM performance reviews, and had no involvement in APM compensation.  ¶¶¶ 169, 180, 191, 192, 204- 208, 213, 215.  Plaintiff also had no authority to deviate from time off request policies or to deny any time off request.  ¶¶ 129-132.  As to time off, Plaintiff performed a record-keeping function.  ¶ 129.  Plaintiff had no authority to assign work to or set work hours for APMs.  ¶ 200.  Plaintiff therefore was not a "manager" under the common or legal use of the term under the FLSA.  Therefore, Plaintiff should be found, as a matter of law, not to have qualified for the "executive" exemption.  See Siegel v. Bloomberg L.P., 13 Civ. 1351 (DF), 2016 WL 1211849 at *3 (S.D.N.Y. Mar. 22, 2016) (granting summary judgment to plaintiffs and noting that "The exemption question under the FLSA is a mixed question of law and fact.  The question of how the employees spent their working time is a question of fact.  The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.  Here, there is no genuine dispute about how plaintiffs spent their working time.  The dispute is over whether plaintiffs' activities excluded them from the overtime benefits of the FLSA.").

C.    **Plaintiff Is Entitled to Summary Judgment on Willfulness**

The FLSA provides that, "Any employer who violates the provisions of [section 207] of this title shall be liable to the employee or employees affected in the amount of their unpaid ... overtime compensation ... and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  Courts may limit or not award liquidated damages, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] ...." 29 U.S.C. § 260.  "To prove a willful violation of the FLSA, [] it must be established that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Parada v. Banco Indus. De Venez., C.A., 753 F.3d 62, 71 (2d Cir.2014).  The undisputed facts support a finding that Defendants acted in reckless disregard of their FLSA obligations by, *inter alia*, failing to perform any audit, review or investigation into Plaintiff's correct overtime classification, despite notice of Plaintiff's concerns that she was misclassified.

Defendants repeatedly, throughout Plaintiff's employment, failed to properly classify Plaintiff as overtime eligible, or to make any reasonable effort to determine whether an overtime exemption correctly applied to her.  ¶¶ 250-271.  There is no credible evidence in the record that any audit or review was conducted to determine whether or not Plaintiff's work made her overtime eligible.  This occurred despite Defendants being repeatedly put on notice that Plaintiff did not fall under any overtime exemption, including after Plaintiff brought the issue to Leslie Winkler's attention during a presentation by the Company's attorneys regarding overtime.  ¶¶ 234-241.  Judy Caplan even acknowledged in writing that replacing Plaintiff would require

dividing up the administrative and operational functions of her job and hiring two employees at salaries of $56K or higher, which was roughly the APM starting salary.  Ex. 28.

Additionally, there is no record evidence that Defendants acted in good faith or had reasonable grounds for their failure to comply with the FLSA's overtime requirements.  See 29 U.S.C. § 260.  Therefore, summary judgment on the issue of "willfulness" should be granted in Plaintiff's favor, entitling Plaintiff to the recover overtime wages under the FLSA for the three years preceding the filing of this case, plus an additional equal amount as liquidated damages for all back wages owed.  See 29 U.S.C. § 216(b); NYLL § 198.

### D. Plaintiff Is Entitled to Summary Judgment on the Overtime Calculation Method

The evidence shows that Plaintiff's lost overtime wages should be calculated using the time-and-a-half method for all hours worked over 40, rather than the so-called "fluctuating workweek" ("FWW") method.  There was never any "clear mutual understanding of the parties that [Plaintiff's] fixed salary is compensation [] for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period," which is required to apply the FWW method (20 C.F.R. § 778.114(a)), entitling Plaintiff to summary judgment as to the method of overtime calculation.

### i. The "Time-and-a-Half" Method Versus the Strictly Limited "FWW" Model

The FLSA requires employers to pay overtime wages at the rate of one-and-one-half times the employees' regular rate of pay.  See 29 U.S.C. § 207.  Plaintiff's overtime damages should be calculated using the time-and-one-half method: weekly salary divided by 40 hours, multiplied by 1.5 times her overtime hours.  See Yourman v. Dinkins, 865 F. Supp. 154, 165

(S.D.N.Y. 1994) (when the parties fail to agree on the number of hours a salary is designed to cover, the "solution" is to use the scheduled hours of work).

The FWW is an exception to the normal overtime calculation.  See Martinez, 930 F. Supp. 2d at 528.  The FWW method favors employers significantly more than the traditional time-and-a-half pay scheme, because "the longer the hours [worked,] the less the rate and the pay per hour." Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 (1942).  Instead of dividing pay by only 40 hours to determine the regular rate, and then requiring time-and-one-half the regular rate for overtime hours, the FWW treats the salary as covering all hours worked and allows an employer to pay workers only an additional (and reduced) "half-time" overtime rate. As the FWW allows an employer to spread salary over all hours worked, the more an employee works, the less she makes per hour, and the lower her overtime rate.

The U.S. DOL promulgated regulations that sought to codify the proper way to perform this alternative method of overtime calculation.  See Klein v. Torrey Point Grp., LLC, 979 F. Supp. 2d 417, 436 (S.D.N.Y. 2013); 29 C.F.R. § 778.114.  There are strict prerequisites to application of the FWW; "five discrete criteria" must be satisfied:

> (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed  weekly salary which remains the same regardless of the number of hours the employee works during the week; (3) the fixed amount is sufficient to provide  compensation at a regular rate not less than the legal minimum wage; (4) the employer and the employee have a clear **mutual** understanding that the employer will  pay the employee a fixed salary regardless of the number of hours worked; and (5) the employee receives a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of forty (40) during the week.

See Ayers v. SGS Control Servs., Inc., 03 Civ. 9078(RMB), 2007 WL 3171342 (S.D.N.Y. Oct. 9, 2007)(emphasis added).  This is intended to ensure that the FWW method does not permit employers to manipulate pay scales to escape the FLSA's overtime requirements. See Klein, 979

F. Supp. 2d at 436.  If an employer cannot meet all of the FWW criteria, it cannot use the method.  Id.; Yourman, 865 F. Supp. 154.

### ii.     The "FWW" Model is Inapplicable in this Case

Here, neither the DOL rule nor the FWW method pursuant to Missel can be used to calculate Plaintiff's overtime damages.  The DOL rule cannot be used because it is a forward-looking rule that cannot be used in cases such as this one, where employees were misclassified as exempt because Plaintiff never received any overtime for hours over 40.  See Klein v. Torrey Point Grp. LLC, 979 F. Supp. 2d 417, 437 (S.D.N.Y. 2013) ("The regulation cannot apply to misclassified employees.").  Defendants also have not met the strict requirements of using the DOL rule or Missel rule, as there was no clear  mutual understanding that Plaintiff's salary covered all hours worked, regardless of how many were worked.

Defendants also are not entitled to use the FWW as a matter of law because they did not pay any overtime to Plaintiff.  "Contemporaneous payment of overtime compensation is a necessary prerequisite for application of the fluctuating workweek method," and where a defendant has not done so, the FWW cannot be used.  Klein v. Torrey Point Grp., LLC, 979 F. Supp. 2d 417, 437 (S.D.N.Y. 2013); Costello v. Home Depot USA, Inc., 944 F. Supp. 2d 199, 204 (D. Conn. 2013).  It is undisputed that Defendants did not pay Plaintiff overtime while she was employed, and thus they cannot use the FWW.

Defendants also are not entitled to use the FWW because they cannot show a clear mutual understanding that Plaintiff's salary was intended to cover all hours worked, rather than that the salary covered set hours, and extra time was uncompensated.  Here, Defendants did nothing to cause Plaintiff to believe her salary did not cover a 40- hour  workweek.  ¶¶ 29, 30-31.  To  use the  FWW, Defendants have to show that Plaintiff understood that her salary was

intended to pay for fluctuating hours. See Blotzer v. L-3 Communications Corp., 11 Civ. 274 (TUC)(JGZ) 2012 WL 6086931, 10-11 (D. Ariz. Dec. 6, 2012). Plaintiff did not have this understanding. What the salary was intended to compensate is at best unclear, and it is Defendants' burden to establish that there was a clear mutual agreement as to the hours the salary was intended to cover. See Stultz v. J.B. Hunt Transp. Inc., 13 Civ. 13705 (PJD), 2014 WL 3708807, at *3 (E.D. Mich. July 28, 2014) ("Defendant points to no evidence of any mutual understanding between Plaintiff and Defendant that Plaintiff's fixed salary was meant to compensate him for any and all hours that he worked, and the Court is not aware of any such evidence.").

If the employer cannot show that the parties understood the salary was intended to cover fluctuating hours, the FLSA's presumption applies that a salary is intended to cover 40 hours. See Solis v. Cindy's Total Care, Inc., 10 Civ. 7242 (PAE), 2012 WL 28141 (S.D.N.Y. Jan. 5, 2012) (rejecting fluctuating workweek analysis because there was no evidence showing employer-employee agreement that employee's salary covered hours over 40). Accordingly, Plaintiff is entitled to judgment as a matter of law that the "time-and-a-half method," and not the "FWW" method, applies to calculate her unpaid overtime damages.

### E.    Defendants Have Failed to Show that there Is No Genuine Issue of Material Fact that Terra Was Not Plaintiff's Employer

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Second Circuit has held:

> The Supreme Court has emphasized the "expansiveness" of the FLSA's definition of employer. Above and beyond the plain language . . . the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have "the widest possible impact in the national economy."

Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 136, 139 (2d Cir. 1999) (internal citations omitted) (50% owner of a company held to be an employer for purposes of FLSA liability).  An entity is an employer for purposes of the FLSA if it has the authority to control the employee's conduct.  See Zheng v. Liberty  Apparel Co. Inc., 355  F.3d 61, 66 (2d Cir. 2003).  A corporate parent can be liable as an employer under the FLSA for the actions of its wholly owned subsidiary.  See Hart v. Rick's Cabaret Int'l, Inc., No. 09 Civ. 3043, 2010 WL 5297221, *3 (S.D.N.Y. 2010); Herman, 172 F.3d at 136, 139 (corporate parent was an employer because it controlled employees' work by distributing rules/guidelines and ensuring enforcement).

Here, Terra wholly owns Penmark Management and Halstead.  As in Hart, where the corporate parent controlled the employees' work by distributing rules and guidelines, Terra disseminated a Code of Conduct and other policies that Plaintiff was required to certify.  ¶ 297.

Terra also controlled the Human Resources, payroll and legal departments.  ¶ 289.  Terra employees, including Principal and Chairman David Burris, also assigned work to Plaintiff, which only served the purposes of Terra, and not Halstead or Penmark Management. ¶ 309. Employees also were transferred between corporate entities owned by Terra, including Halstead. ¶ 302.  Decisions regarding Plaintiff's compensation also were made by Terra's "higher-ups," as well as whether to offer Plaintiff salary to convince her to remain an employee. ¶ 303.

Accordingly, Terra, along with Penmark and Halstead, engaged in a unified operation with common control for a common business purpose.  Defendants have produced no evidence negating Terra's employment of Plaintiff, beyond simply asserting that Penmark Management and Halstead were Plaintiff's employers.  This is immaterial under 29 U.S.C. § 203(d), because an indirect employer is also an employer.  Therefore, summary judgment regarding Terra's status as an employer should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court grant

Plaintiff's Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment,

and allow the parties to proceed to trial on damages.

Dated: June 30, 2017
      New York, New York

                                    Respectfully submitted,

                                    **WIGDOR LLP**

                                    By: _____
                                          Lawrence M. Pearson
                                        Tanvir H. Rahman

                                    85 Fifth Avenue
                                    New York, NY 10003
                                    Telephone:  (212) 257-6800
                                    Facsimile:  (212) 257-6845
                                    lpearson@wigdorlaw.com
                                    trahman@wigdorlaw.com

                                    *Attorneys for Plaintiff*